BAILEY ALDRICH, Senior Circuit Judge.
 

 In this diversity action plaintiffs seek specific performance or damages for a breach of contract to buy real estate, and defendant denies the making, or the sufficiency of the articulation. At the close of plaintiff’s evidence the court ordered a verdict for defendant on the ground that no reasonable jury could find that a contract existed. We affirm.
 

 Plaintiffs Penner and Dolan are trustees of two alleged nominee trusts that own three sizeable industrial buildings collectively known as 495 Technology Center West, hereinafter the “property.” Defendant Equitable Real Estate Management, Inc. acquires investment property for defendant Equitable Life Assurance Society of the United States, its parent, hereinafter, collectively, “Equitable.” Paul Magg-iore is the sole beneficiary of the trusts. Hugh McWhinnie is a local Equitable repre
 
 *771
 
 sentative for “production.” Scott Hughes was the representative of the firm that Maggiore selected as exclusive broker.
 

 In January, 1989 the parties exchanged information and visited the property, and on February 3 McWhinnie wrote Hughes a letter of intent. It was not accepted by Maggiore, and on February 17 McWhinnie sent a revision. He met with Hughes and Maggiore to discuss it on February 22 and the latter found it acceptable as a basis for negotiation. On March 10 McWhinnie sent another letter to Hughes that Maggiore also accepted. Equitable then started to exercise a period of “due diligence,” which, briefly, is a study of leases, debt structure, construction problems (one building was not yet completed), budgets, maintenance and repair, etc. It furnished Maggiore with a partial punch list that he accepted.
 

 On May 2 McWhinnie sent a letter to Maggiore personally that he accepted on May 8. On May 25 he sent another letter that Maggiore also accepted. Further discussions then took place, including the submission and revisions of a purchase and sale agreement, and proceeded until April 5, 1990. On that date Equitable sent Maggiore a letter “withdrawing] our interest in purchasing the property.” Plaintiff’s position is that a contract had already been formed by Equitable’s May 2nd and May 25th letters, and that it was too late to withdraw. Both sides are seriously concerned, as the purchase price was set as $21,400,000 in May, 1989, and the market has since drastically declined.
 

 Prima facie, and taking a broad look, it is highly unusual that a transaction of this nature and magnitude would be cemented by short letters, with so many more terms needed that no final resolution was accomplished in the ten months following.
 
 See Air Technology Cory. v. General Electric Co.,
 
 347 Mass. 613, 199 N.E.2d 538 (1964). Yet, according to plaintiffs, three pages, two devoted to leases, contain all the “essential terms” — the property; the purchase price; the method of payment, and a seller-management provision. The remaining matters are “non-material” and “reasonably completable by a fact finder.” “The negotiation process between the parties culminated in the May agreement.”
 

 Without considering substance, we note the parameters of the further conduct the parties found necessary.
 

 July 11. Equitable’s attorney forwards a provisional draft purchase and sale agreement for consideration; 26 pages, plus ten exhibits, with notations for more (ultimately 26). Article 26 of the agreement provided,
 

 26.
 
 Submission Not an Offer.
 
 The submission of a draft of this agreement or a summary of some or all of its provisions does not constitute an offer to buy or to sell the Property, it being understood and agreed that neither Buyer nor Seller shall be legally obligated with respect to the purchase or sale of the Property unless and until this agreement has been executed by both Buyer and Seller and a fully executed copy has been delivered to each.
 

 August 4. Plaintiff Penner, as attorney, writes of reviewing “your proposed Agreement with my client,” reiterating 15 pages of his comments and desired changes not yet reviewed with client. No dissent was expressed to the Article 26 reservation.
 

 August 24. Seven page reply from Equitable’s counsel, with resubmission of July draft with many inked changes.
 

 September 5. Seven pages of “responses” from Penner, “subject to client’s review.”
 

 September 20. Equitable responds to Penner.
 

 October 3. Penner responds to Equitable, ten pages.
 

 December 13. (We find no interim writing). Equitable counsel submits further revised draft of agreement.
 

 December 26. Penner to Equitable, seven pages. “Given the number of issues and questions remaining ... I thought it more efficient to respond in writing.”
 

 February 15, 1990. Equitable's counsel submits further revised draft to be followed by letter.
 

 February 16. Equitable letter pointing out that Maggiore is still in default in
 
 *772
 
 furnishing items requested for due diligence.
 

 March 29. Penner replies in a six page letter noting,
 
 inter alia,
 
 that a number of matters “still need discussion.”
 

 April 5. Equitable letter “withdraw[s] our interest,” reciting,
 
 inter alia,
 
 Magg-iore’s continual failure to assist due diligence.
 

 Obviously there had been much communication between the parties besides these exhibits. No rejection was ever made, however, of the disclaimer in Article 26, that neither party was obligated until a purchase and sale agreement was executed and delivered. Plaintiffs’ main brief before us, otherwise detailed, does not mention it. Prodded by Equitable, their reply brief uses the words “disingenuous” and “diaphanous,” and charges that “Equitable’s ostrichism may provide a commodious sense of security, [but] does not bury the legal consequences of the May 2nd and May 25th documents.” It concludes,
 

 Equitable did not invoke the disclaimer provision of the draft purchase and sale agreements nor the letters of intent when it attempted to terminate its obligations under the May documents.
 

 We can think of no reason why, after a disclaimer many times repeated, Equitable should need to refer back to the record. Its April 5 letter fits squarely within the Article 26 disclaimer.
 

 Paul, the end result is that from the information we have finally received from you, we can only conclude that the property does not meet our criteria for investment. We have, therefore, withdrawn our interest in purchasing the property.
 

 Plaintiffs are left with saying that the disclaimer is meaningless because, while earlier letters had said they were statements of intent, only, and not binding, the May letters had not indicated a reservation. We do not agree.
 
 [1]
 
 If, however, there was any ambiguity in plaintiffs’ favor, surely it was resolved by Article 26. If plaintiffs felt the May letter established a contract, the July disclaimer was a breach and a counter offer that behooved a response, not constant silent acceptance and continued negotiations over a protracted period.
 

 It is true that a binding agreement may be reached even before an anticipated purchase and sale agreement is executed,
 
 see, e.g., Chedd-Angier Production Co., Inc. v. Omni Publications International, Ltd.,
 
 756 F.2d 930 (1st Cir.1985);
 
 Goren v. Royal Investments, Inc.,
 
 25 Mass.App. 137, 516 N.E.2d 173 (1987), although we note that no witness could recall one in a transaction of this magnitude. It defeats reason, however, to say that none is needed when the parties expressly say that there must be one. To consider the May letters a commitment is not a one-way proposition; Maggiore, too, as of that date, might not have wanted to feel irretrievably bound to what some later fact-finder might “reasonably complete.”
 

 Plaintiffs tell us that Equitable withdrew because of a decline in the economy that had depressed the value of the property. If no contract had been reached, this would be irrelevant unless, conceivably, there was an issue of bad faith. No such issue was raised by the pleadings or advanced at trial. As to there being a contract, like the district court, we see none possible.
 

 Affirmed.
 

 [1]
 

 . McWhinnie’s May 2, 1989 letter commenced, I am writing to confirm our recent conversations regarding Equitable’s interest in purchasing the above captioned property. Let me restate the revised major business terms of the proposed purchase as follows:
 

 Is an expression of "interest" such a positive commitment that it is necessary to qualify it? Does a "proposed purchase” go further than intent, unless that meaning is expressly negated? Compare Fenner’s use of "proposed” in her letter of August 4,
 
 ante.
 
 Or does May 25th's, "I still believe it is possible to close by early July, 1989 if we start the process soon” cement a commitment? Finally, it is to be noted that plaintiffs’ brief describes the May 2nd letter as "confirming Equitable’s intent to purchase the property,” evidently forgetting Maggiore’s testimony that a letter of intent, even when accepted, is not a contract.